THE COAL ARBITRATION SERVICE

IN THE MATTER OF THE ARBITRATION BETWEEN

MURRY AMERICAN ENERGY, INC.
THE MONONGALIA COUNTY COAL CO.           CASE NO. 11-31-16-364
MONONGALIA COUNTY MINE

AND                                      BEFORE  JACQUELIN  F. DRUCKER, ESQ.
                                                        ARBITRATOR

UNITED MINE WORKERS OF AMERICA
DISTRICT 31
LOCAL UNION 1702
                                                        AWARD
GRIEVANCE: GIBSON

APPEARANCES:

    FOR THE UNION:        JOE REYNOLDS, FIELD REPRESENTATIVE, DISTRICT 31
                          310 GASTON AVENUE
                          FAIRMONT, WEST VIRGINIA  26554
                          JREYNOLDS@UMWA.ORG

                          JAMES  PONCEROFF, CHAIRMAN, MINE COMMITTEE
                          TIM GIBSON, GRIEVANT
                          ERIC GREATHOUSE, FORMER PRESIDENT, LOCAL 1702
                          SHAWN SAMPSON, PRESIDENT, LOCAL 1702
                          JEFF REEL, MINE COMMITTEE (OBSERVING)
                          RYAN LEMLEY, MINE COMMITTEE (OBSERVING)

    FOR THE COMPANY:     KENNETH R. ELLER, CONSULTANT
                          ELLER & ASSOCIATES, INC.
                          6335 MITCH HAVEN DRIVE
                          BETHEL PARK, PA  15102

                          TIM BAUM, ASSISTANT TO THE MANAGER OF HUMAN RESOURCES
                          MURRAY AMERICAN ENERGY, INC.
                          46226 NATIONAL ROAD
                          ST. CLAIRSVILLE, OHIO 43950
                          TIMBAUM@COALSOURCE.COM

                          TERRY RAMSEY, ASSISTANT SUPERINTENDENT
                          KAREN MOHAN, SUPERVISOR, HUMAN RESOURCES

DATE OF HEARING:         JUNE 15, 2017

LOCATION OF HEARING:     HOLIDAY INN EXPRESS
                          FAIRMONT, WEST VIRGINIA

EXHIBIT B

## I. PROCEDURAL BACKGROUND

The instant arbitration proceeds pursuant to the National Bituminous Coal Wage Agreement of 2011 ("NBCWA") and involves a grievance brought by the United Mine Workers of America, Local 1702 ("Union," "UMWA," or "Local 1702") against Murray American Energy, Monongalia County Coal Company, Inc. ("Company," "Employer," or "Management"). Pursuant to the processes agreed to by the parties, the undersigned was selected and appointed as Arbitrator in this matter, and the hearing was held on June 15, 2017, at the Holiday Inn Express, Fairmont, West Virginia. Throughout this proceeding, both parties were ably represented. Each party was provided a full and fair opportunity to present evidence through documents and testimony. All witnesses testified under oath and were subject to direct, cross, and redirect examination. In reaching the conclusions and making the Award set forth herein, the Arbitrator has given full, fair, and careful consideration to all evidence of record, all arguments, and the extensive authorities and citations offered by the parties.

## II. ISSUES

The parties agree regarding the general nature of the matter in dispute, but they do not agree to the precise wording of the issue. The Union phrases the issue as follows: "Did Management of the Monongalia Coal Company (formerly the Blacksville No. 2 Mine of Consolidation Coal Company) violate the terms and conditions of the National Bituminous Wage Agreement of 2011 by enlisting the use of contractors to perform work of assembling the Longwall Mining Unit? If so what shall the remedy be?" The Company poses the issue as follows: "Did the Employer violate any of the terms of the NBCWA of 2011 when it retained a contractor to modify, enlarge and construct a new 1200 foot "Monorail System" to improve the safety and efficiency of mining a new panel of virgin coal reserves, while Grievant Tim Gibson was fully employed performing other assigned work? Otherwise, what is the proper remedy, if any?"

### III. FACTS

The instant grievances assert that Management violated Article 1A of the Wage Agreement when a contractor was used on April 2, 3, 4, and 8, 2016, to perform work relating to the monorail system for 12 West longwall panel. The use of the contractor is not in dispute, and the parties agree that the resolution of this case turns, at least initially, on how this work is characterized, within the concepts address in Article 1A. Thus, the function and structure of the monorail and the process of moving, installing, and extending it at the face of 12 West must be examined and carefully considered.

The Monongalia County Mine, formerly known as the Blacksville No. 2 Mine, operates as a longwall mining system (as contrasted with the now passé room-and-pillar method), extracting virgin coal using continuous mining machines and other equipment such as roof bolters, leaving pillars behind as the mining progresses. A narrow-gauge rail transports workers, supplies and equipment, while a conveyer belt system is used to transport coal to a shaft, and the coal then is transported to the surface through skip hoists operated on a monorail system, which is at issue in this case. When at the surface, the coal travels via conveyor belts and silos to the preparation plant. This process continues at a given panel throughout the course of, typically, nine months, yielding approximately 3.3 million tons of virgin coal. When the coal in a given panel has been extracted, the operation is moved to the next panel, and certain of the systems are taken down, moved, and reinstalled at the new panel as part of the move. One of the elements that must be relocated is the Longwall Monorail System, which is torn down, taken out, shipped to the next panel, and installed to prepare for extraction and movement of virgin coal from that panel.

The Longwall Monorail System was described in a Management exhibit as offering "a safe and highly efficient means of managing the services required to operate the Longwall face." (Management Exhibit D.) As the documents and witnesses explained, in this system, cables and hoses are suspended from a roof-mounted monorail beam that provides a series of support trolleys. The components are suspended, off the floor, and thus do not impede the walkways. The trolley compress, in an accordion fashion, as the wall face retreats. The manufacturer touts

the the "[m]odular design integrated with transportation sleds facilitates a highly efficient and damage free means of installation and end of panel relocations."

In the case at hand, work on the 13 West Longwall panel was completed on March 29, 2016, and extraction was to commence next at the 12 West Longwall panel. As the 13 West monorail system was still in use, the monorail from the depleted 20 West Longwall panel was disassembled and moved to 12 West. That monorail, however, was only 900 feet when extended. The 12 West Longwall panel itself was 1200 feet, an expansion that reduced the need to move the power center from every three blocks to every four blocks. Thus, to equip 12 West with a complete monorail, another 300 feet were needed at the end of the monorail, extending it to the stage loader. Terry Ramsey, the Assistant Superintendent, described the additional footage it as "a cap" on the monorail. The overhead beams had been installed by unit personnel, but the remainder of the work installing the additional 300 feet was done by a contractor. This involved the hanging of trolleys, hanging of cables and hoses, and securing these elements. Mr. Ramsey testified that this was work that unit personnel were qualified to do, could have done, and had customarily done in the past.

Eric Greathouse, former President of the Local, testified that when he first started working in the mining industry 34 years ago, monorails typically were 600 feet long; over the years the length has extended as advances in technology allowed for increases in other aspects of mine production, such as the expansion, in this case, of the panel from 900 to 1200 feet. The work of taking the monorail system down, moving it, and installing the monorail at a new panel, Mr. Greathouse said, echoing Mr. Ramsey's testimony, always had been done by unit personnel. Mr. Greathouse also noted that, in the past, unit personnel have installed all extensions of the monorail as it was periodically extended from the 600-foot-long system. He was not aware of and Management cited no instance in which contractors at this mine had handled work of this nature previously. Mr. Gibson, the Grievant, has worked at the mine for 8 years and 36 in the mining industry. He recalled that, during his years of service at this mine, he has been involved with the re-installation of a monorail system approximately 16 or 17 times.

Efforts usually are made to complete the move in ten days, minimizing the time required to effectuate the restart of extraction on the new panel. During a move all personnel are on duty to expedite the process, and overtime is plentiful. In this case, however, the startup of 12 West was delayed by one week, because the high pressure hoses were not available when the contractors were ready to install them. The work had been completed on or about April 8, and the restart commenced on April 14, 2016. (The Arbitrator notes, however, that it has been represented that the mine was idle from April 14 to 21, 2016, so it is not clear when the extraction of coal resumed.)

The use of the contractor for the 300-foot addition to the monorail system gave rise to the instant grievances. In Grievance No. 1702-32-16, the Union cited the work that was done on April 2, 3, and 4, 2016, and, in Grievance No. 1702-33-16, it cites the work performed on April 8, 2016. (Both grievances were brought in the name of Mr. Gibson, but four additional workers also were named on each. The Union prior to hearing, however, clarified that the only Grievant on whose behalf they are pursuing these cases is Mr. Gibson.) The grievances note the specific aspects of the project, including but not limited to hanging monorail, installing hoses and cables on trolleys, and securing same, and it is undisputed that these are tasks that were performed by contractor.

At the time, there were approximately 178 bargaining unit workers active at the mine, and 189 were on lay-off status. Mr. Ramsey acknowledged that workers were on lay off, but he observed that the project lasted only four days and noted that bringing workers back from lay off, which involves a number of steps, including the notice process and drug and alcohol testing, takes time and can be complicated.

These were difficult times for this mine and the mining industry in general. Management reports that the future of the mine was uncertain and that it had been idled from March 31, 2015, to June 17, 2015, and then again for a week in August 2015, and then from November 23 to December 16, 2015, and again on December 25, 2015. In 2016, the mine was idled from January 4 to February 7, 2016. As noted above it also appears that, after the monorail move was completed at 12 West, the mine was idled again from April 14 to 21, 2016.

## IV. RELEVANT CONTRACT LANGUAGE

The parties agree that the governing language in this case is found in Article 1A, which provides as follows, in pertinent part:

### Article 1A – SCOPE and COVERAGE

*Section (a)*    **Work Jurisdiction**

The production of coal, including the removal of overburden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway or rail not owned by Employer), repair and maintenance work normally performed at the mine site or at a central shop of the Employer and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above shall be performed by classified Employees of the Employer covered by and in accordance with the terms of this Agreement.  Contracting, subcontracting, leasing and subleasing and construction work, as defined herein, will be conducted in accordance with the provisions of this Article.

Nothing in this section will be construed to diminish the jurisdiction, express or implied, of the United Mine Workers.

***

*Section (d)*    **Management of the Mines**

The management of the mine, the direction of the working force and the right to hire and discharge are vested exclusively in the Employer.

***

*Section (g)*    **Contracting and Subcontracting**

    (1) Transportation of Coal --- [omitted]

    (2) Repair and Maintenance Work – Repair and maintenance work of the type customarily performed by classified Employees at the mine or central shop shall not be contracted out except (a) where the work is being performed by a manufacturer or supplier under warranty . . . ; or (b) where the Employer does not have available equipment or regular Employees (including laid-off Employees at the mine or central shop)

>> with necessary skills available to perform the work at the mine or central shop.

***

> *Section (i)* **Construction Work**
>
> All construction of mine or mine related facilities including the erection of mine tipples and sinking of mine shafts or slopes customarily performed by classified Employees of the Employer normally performing construction work in or about the mine in accordance with prior practice and custom, shall not be contracted out at any time unless all such Employees with necessary skills to perform the work are working no less than 5 days per week, or its equivalent for Employees working on alternative schedules. . . .

## V. DISCUSSION

The parties agree that a central determination in this case is how the work at issue is characterized for purposes of Article 1A. Article 1A, of profound importance to both parties, has been the source of a significant number of disputes, perhaps more so in recent years as the parties have shared in the struggle to keep the coal mining industry afloat. The Employer turns to Article 1A to emphasize its rights and the ways in which the potential for and discretion in the use of contractors is addressed. The Union cites these provisions as the source of protection of unit work, stressing that Article IA was intended to guard against the risk of erosion, which the Union describes as an "unrelenting, constant and continual" threat.

Article 1A identifies the work that is exclusive to the bargaining unit and also that which is of limited exclusively, in that it may be available to Management to contract out under certain limited circumstances. Under Article 1A, Section (a), Work Jurisdiction, the "classified Employees" are to perform the work that is involved with the production of coal. The contract states specifically that "production of coal" includes the preparation, processing, cleaning, and transportation (with limits not relevant here) of coal, and repair and maintenance work normally performed at the mine site or at a central shop of the Employer. The scope of work, however, does not stop with those specified functions and processes; the parties went on to include a

broadening concept, which is "work of the type customarily related to all of the above." Under Article 1A, Section (a), work falling within this broad definition "shall be performed" by bargaining unit personnel, with very limited exceptions. The limited exceptions are addressed in Sections (g) and (i). Section (g) relates to transportation of coal and to "repair and maintenance," and it specifies the circumstances under which contracting of such work may occur. Specifically, "repair and maintenance" may be contracted out only when the work is covered by a manufacturer's warranty or when there is no available equipment or there are no available regular employees (including those on lay-off status). Section (i) addresses construction, and it carves out a slightly more generous exception for Management for work that is identified as "construction of mine or mine related facilities. . . . customarily performed by employees normally performing construction work in or about the mine in accordance with prior practice and custom." This work is not be contracted out except in situations in which all employees with the necessary skills are working no less than five days per week.

In analyzing cases of this nature, Arbitrator Phelan, a leader in the discourse on this topic, noted in *Sunnyside Coal Company, Sunnyside Mine and UMWA, District 22, Local 9958*, Case No 88-22-92-76, at pp. 15-187 (Phelan, March 13, 1993), that "[t]hese different kinds of jurisdiction over different categories of work, all of which fall within the general work jurisdiction of the classified Employees, make it important to properly categorize the disputed work in contractual terms. How the work is categorized may make the difference between exclusive jurisdiction over the work and something less than exclusive jurisdiction." Arbitrator Phelan then summarized the contract provisions to be examined in determining "whether the contracting out of the work violated the work jurisdictional rights of the classified Employees claiming the work." He continued, in a point of significance for the instant case, as follows: "And if the work is not covered by any of those provisions in Section (g) or (i), then it is Article IA, Section (a) that is to be applied," which, as noted above, reserves the work to the unit.

The Company acknowledges that the monorail work at issue is customarily related to the production of coal, and the Company recognizes how broad that aspect of the definition is. It emphasizes, however, that Article 1A precludes contracting only if the work is not otherwise

covered by one of the exceptions stated. In this regard, Management contends that the work at issue was construction, and, as employees with the necessary skills then were working five days per week, it was permissibly contracted out under Section (i). In the alternative, Management argues that, if the work is not considered to be construction it should be regarded as "repair and maintenance," which would be permissible under Section (g)(2) because, says the Company, regular employees with the necessary skills, including those on lay off, were not reasonably available. As an approach to analysis, it is not illogical for the Company to present alternative arguments, and both were ably presented. This approach, however, must not be mistaken for reasoning that, if work is not construction, it must be repair and maintenance.

In fact, this is the Union's argument. The Union objects to the characterization of the work as either "construction of mine or mine related facilities" or as "repair and maintenance." Rather, the Union contends that the work falls within neither exception and instead is readily included within the scope of "work of the type customarily related" to the production of coal. As to that point, it has been acknowledged in the detailed testimony by witnesses for both parties, it is reflected in the extensive exhibits ably presented by both parties, and it is revealed through the wealth of arbitral tradition presented by both sides that such monorail-related work falls squarely within this concept and, if not subject to one of the exceptions, is within the exclusive jurisdiction of the classified Employees. Thus, the issue to be resolved is whether the exceptions stated in Section (g) or Section (i) apply.

The Arbitrator turns first to the question of whether the work is "repair and maintenance" and thus subject to the exception found in Section (g)(2). As Arbitrator Nicholas noted in *The Pittsburgh & Midway Coal Mining Company, North River Mine and UMWA, District 20, Local 1926*, Case No. 02-20-05-060, page 14 (Nicholas, 2005), quoting Arbitrator Phelan, repair and maintenance involves "fixing or servicing existing machinery and equipment, and is done for the purpose of restoring it to proper working order or keeping it in good working order. . . ." Examining the project at issue, no element of the Longwall Monorail system at the 12 West panel has been shown to have been in need of repair, replacement, or restoration or preventative efforts to ensure continued safe, efficient operation. The work instead involved the integration of

an addition or "cap" to the large existing system, which cannot logically be considered to have been repair and maintenance. Thus, the exception found in Article IA, Section (g) does not apply.

The Company's argument suggests that, if the work is not repair and maintenance, it must be construction. But, as noted by Arbitrator Dissen in *Southern Ohio Coal Company and UMWA District 31, Local 1949*, Case No. 88-31-89-180, pages 11-12 (Dissen, 1989), "[t]he Employer's contention in this regard overlooks the fact that merely because a particular work project does not fit the category of repair and maintenance work does not necessarily mean that the project must be deemed to qualify as construction work. Rather, the work may fall within the range of incidental duties historically entrusted to the bargaining unit and governed by the 'customarily related to' language. . . ." See also *Consolidation Coal Company Shoemaker Mine and UMWA District 6, Local 1473*, Case No 93-6-97-130 (Krider, 1997), related to the installation of a track loop, in which Arbitrator Krider noted that the Company was striving, ineffectively, to define anything that was not repair and maintenance as construction.[1]

Thus, as the contracted work was not repair and maintenance, the question of whether the work is covered by the construction exception stands on its own. For this, we return to the precise contract language, which is not just "construction," but, rather, the more limited "construction of mine or mine-related facilities." The Union argues that the addition of the 300-foot monorail cap did not, by any sense of common parlance, relate to the construction of a "facility." Indeed, in evaluating the installation of a track loop in *Consolidation Coal Company Shoemaker Mine*, Arbitrator Krider noted, as have arbitrators in a number of other awards cited, that the Section (i) exception is precise in that it applies not to the unadorned term "construction" but, rather, to "construction of mine or mine-related facilities." He noted that, if general construction were

---

[1] The Company aptly has noted a corollary under Article 1A, which is that just because an employer for many years may have had unit employees perform construction work does not impair the ability to contract for that work if the factors required by Section (i) are met. Construction work is construction work, and even if customarily performed by unit employees, the limited option to contract for such work nonetheless applies if the factors set forth in Section (i) are met.

intended, the parties could have so stated, and he proceeded with an analysis of whether a new facility had been created, which, in the case of the track loop, had not.

In assessing whether work should be characterized as construction, Arbitrator Nicholas's decision in *Pittsburgh & Midway Coal* again is useful, as he continues his reference to Arbitrator Phalen's analysis, noting, "When the work involves the erection, fabrication or installation of new mine or mine-related facilities or additions to such facilities, the work normally is considered to be construction." To flesh out this concept in the case at hand, each party has provided the Arbitrator with a well-analyzed collection of Panel awards. The focus in most of these cases has been on what is new versus what is old and whether the work led to the creation of something new. In fact, in Arbitrator Phelan's decision in *Sunnyside Coal Company*, he found that the work there, an archway, was construction, holding, "A completely new structure was being assembled and installed so as to form a cover over the canyon stream for a distance of approximately 195 feet. The archway was not replacing any existing structure but rather was a completely new installation built to prevent coal from falling into the stream from overhead."

In an effort to conform to this analysis, Management in this case refers to the "new" 300-foot monorail and the creation of a "near-new" 1200-foot monorail system. Yet it is clear from the record that the Longwall Monorail system itself, including the overhead beams for the additional 300 feet, was a pre-existing system and was simply being relocated as it had been numerous times before. The overhead rails for the addition feet already had been installed by unit employees, and 900 feet, or three-fourths of the system, already existed, had been in operation, and had been taken down, moved, and reinstalled by unit personnel repeatedly. That another 300 feet were added does not give rise to something new or, for that matter, different. The Longrail Monorail system was not altered in any way other than the addition of what the Assistant Superintendent called "a cap" to extend its length. Not a single component has been shown to have been different from what existed in the other monorails or in the 900 feet that were moved from the 20 West panel into the 12 West panel.

This is in contrast to the numerous cases cited by the parties in which contracted work was found to be construction under Article 1A, Section (g) because it was the creation of something new, not the expansion or alteration or improvement of an existing system. For example, a stark contrast is seen in *Consol – Blackville #2 Mine and UMWA District 31, Local 1702*, Case No. D-20091 A1-4 (Frankland, 2009), which involved the construction of six overcasts in the mine to create what the Arbitrator Frankland described as a new system, method and structure that separated fresh air from return, allowing different air currents to cross without mixing. In fact, an award Management has emphasized, *Marion County Coal Company and UMWA District 31, Local 9999,* Case No. 11-31-15-123, pages 20-21 (Allen, November 17, 2015), highlights the distinction. There, Arbitrator Allen found monorail installation work to have been construction, but in that case the work involved what Arbitrator Allen described as "replacement of virtually the entire Monorail System," which had been in existence for ten years. This type of complete replacement task had not previously been done at that mine. Further, in his analysis, Arbitrator Allen considered the intended purpose of the work, noting, "Something of significance was brought into being that had not formerly existed, namely, virtually an 'all-new' Monorail System" with a more powerful shear.

Similarly, in *McElroy Coal Company and UMWA, District 6, Local 1638,* Case No. 88-6-91-699, page 18 (Berman, 1991), also cited by Management, Arbitrator Berman usefully poses a series of questions, originally crafted by Arbitrator Hobgood in *Consolidation Coal Co., Rend Lake Mine,* Case No. 84-12-87-252 (Hobgood, 1987). The first question asks, "What was the objective of the work?" Here, the purpose was not to create or install a new monorail system, as in *Marion County County Coal*, but, rather, to expand, extend, or, as stated by Assistant Superintendent, to "cap" the existing Longwall Monorail system in order to service the expanded range of the 12 West panel. This is contrasted with what Arbitrator Berman called the "all-encompassing" work creating a new chute that was "designed from scratch, fabricated and installed" in *McElroy Coal.* The next question is whether modifications or fabrications were involved and, if so, how substantial were they? The work in this instance, again, as contrasted with that of *McElroy Coal,* did not involve fabrication or modification but rather, was simply the addition and integration of a 300-foot extension that has not been shown to differ in any way

from the pre-existing 900-foot portion that had been moved and reinstalled. The final question is whether "the resulting product differ[ed] substantially from that which left the mine," which is reflective of the creation of an entirely new chute, which was found to be construction in *McElroy Coal*. Here, by continuing contrast, nothing left the mine, no new system was created, and nothing in the existing system was altered.

Based upon a careful review of the work at issue and the standards and traditional analyses relating to Section (i), the Arbitrator concludes that the work performed by the contractor in adding a 300-foot cap to the existing 900-foot Longwall Monorail system, which had been taken down and moved out of 20 West and then moved to and installed at 12 West, cannot be viewed as construction. Thus, the "construction" exception found in Section (i) does not apply. Further, as addressed above, the "repair and maintenance" exception of Section (g) also is inapplicable. Thus, as this work on the Longwall Monorail system is readily recognized as being "of the type customarily related" to the production of coal, it must, pursuant to Article 1A, Section (a), "be performed by classified Employees." Management therefore was in breach of the Wage Agreement when it used a contractor to perform this work on April 2, 3, 4, and 6, 2016.

## AWARD

Having carefully considered the facts of record, the well-presented arguments of the parties, and the wealth of Arbitration Review Board and prior Panel awards that have been presented, the Arbitrator finds, for the foregoing reasons, that the work performed by contractors on April 2, 3, 4, and 6, 2016, in installing the extension or cap on the Longwall Monorail system does not fall within either of the exceptions cited by the Company and is, instead, under Article 1A, Section (a), "work of the type customarily related" to the production of coal. In this regard, the tasks at issue were those that, by the dictates of Article 1A, Section (a), were to have been performed by classified Employees. The grievances, therefore, are sustained. The Company is to cease and desist from contracting for this work. The Grievant is to be made whole through compensation equivalent to the straight-time rate for time attributable to the hours worked by the contractor on April 2, 3, 4, and 6, 2016. The Arbitrator retains jurisdiction to resolve any disputes that may arise regarding the calculation of same.

Dated: January 5, 2018

Jacquelin F. Drucker, Esq.
Arbitrator

## AFFIRMATION

I, Jacquelin F. Drucker, Esq., an attorney admitted to the practice of law in the State of New York, hereby affirm under penalty of perjury that I am the duly appointed Arbitrator in the foregoing matter and that this document, which I have executed on this day, is my Award, issued in resolution of the foregoing matter and in compliance with all relevant and applicable laws.

Dated: January 5, 2018

Jacquelin F. Drucker, Esq.